**In the Disciplinary Matter Involving James J. HANLON.**

No. S–11351.

Supreme Court of Alaska.

April 15, 2005.

Robert C. Erwin, Erwin & Erwin, LLC, Anchorage, for Appellant.

Mark Woelber, Assistant Bar Counsel, Anchorage, for Alaska Bar Association.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The Alaska Bar Association Disciplinary Board recommended suspending James J. Hanlon for three years for misconduct that included knowingly providing misleading information to a client and bar investigators and failing to diligently pursue client matters. He appeals the severity of the penalty, arguing that his cooperation with the disciplinary committee and the effect of the suspension on his practice and family are mitigating factors that, when combined with other mitigating factors, favor a less severe penalty. We hold that Hanlon's cooperation with the disciplinary committee and the negative effects of the suspension do not mitigate his misconduct and suspend Hanlon from the practice of law for three years.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. The Martin matter

In 1995 Hanlon handled a divorce case for Keith Martin, who filed a grievance against Hanlon, claiming that his representation had been inadequate. The bar determined that this grievance was unfounded. In response to Martin's grievance, Hanlon sent him a consent form that would have allowed Hanlon to withdraw his representation of Martin, but Martin did not sign the form. Hanlon did not move to withdraw from representation and remained Martin's counsel of record, but did no further work on the case. Hanlon later realized that he had failed to file certain paperwork related to Martin's case, including proposed findings of fact and conclusions of law, a proposed divorce decree, and a proposed child support order. Martin's divorce therefore remained unfinalized, unbeknownst to Martin, who then remarried several months later. Martin did not discover that he remained married to his first wife until sometime in 1996, when he attempted to sell a car. Martin was forced to obtain a divorce *nunc pro tunc.*

#### 2. The Rednall matter

Joanne Rednall was a state employee who was injured on the job. She hired Hanlon to file a claim on her behalf in 1993. In 1996 Rednall filed a grievance against Hanlon, asserting that he had neglected her claim and failed to respond to her inquiries regarding the case. After the Alaska Bar Association contacted Hanlon regarding this matter, he sent a letter on July 12, 1996, stating: "I believe that Ms. Rednall's claims against me may be largely resolved in the settlement of her claim. I am waiting for her to return the release in exchange for a settlement amount that she agreed to."

On July 26, 1996, Hanlon apparently convinced Rednall to sign and notarize a "Compromise and Release" of all of her claims for the lump sum of $1,600.00. This purported agreement stated that

> Ms. Rednall specifically acknowledges that she has been informed of her right to secure the assistance of counsel, by James J. Hanlon, who has fully informed her of her rights and represented Ms. Rednall's interests in negotiation of this agreement as stated above. Ms. Rednall's counsel agrees that this compromise and release agreement is a fair and equitable settlement of this claim.

Neither Hanlon nor the opposing party or its counsel signed the purported agreement.

On October 24, 1996, in response to a further inquiry made by the bar several weeks earlier, Hanlon wrote another letter in response. He noted Rednall's complaints, and offered a "chronology" of Rednall's claim. Hanlon claimed that it "took some time" to locate the nurse who allegedly gave Rednall the wrong vaccine, and that she admitted to fault but was judgment-proof. Hanlon conceded that "I did not pursue Ms. Rednall's claim with all the vigor that I should have, did not always keep her informed of the status of her case and didn't always return her telephone calls or do so in a timely manner." But he claimed that he "did make several efforts ... over the more than two years I had this claim to resolve Ms. Rednall's claim and am glad to report that we did resolve the claim."

On November 25, 1996 the bar responded to Hanlon's letters, stating that although Rednall had expressed a desire to dismiss her grievance against him, "the nature of her complaints, and your response, suggest that additional information is necessary." The bar noted Hanlon's vague references to a "claim" and "settlement," and Rednall's belief that the state had settled with her, but stated that it had checked the relevant court records and "it appears that there was no claim" against either the state or any of its employees. The bar voiced its "concern that you represented to [Rednall] that you had settled her case when, in fact, you furnished the funds yourself in order to prevent further action against you," and accordingly gave Hanlon twenty days to furnish his complete files on the Rednall matter, as well as an explanation of the claim, the name of any opposing counsel, copies of any settlement checks and disbursement documents, and his final bill and fee calculation.

In response to the bar's ultimatum, Hanlon's attorney furnished Hanlon's Rednall files to the bar on January 3, 1997. Hanlon's attorney admitted that "[n]o case was ever filed against any party," that "[t]here was no attorney on the other side of the 'case' and no 'settlement check' was received from another source," that "[t]he Compromise and Release was prepared solely by James Hanlon," and that all funds paid to Rednall came from Hanlon. Hanlon's attorney admitted that "settlement of the case was undertaken by James Hanlon in order to avoid a claim of malpractice based on delay and to provide his client with some recovery for her claim."

## B. Proceedings

On December 14, 2001 Bar Counsel petitioned the bar's local Area Hearing Committee ("the committee") to conduct a formal hearing on the allegations against Hanlon, and to recommend an appropriate disciplinary action to the bar's Disciplinary Board ("the board").

Hanlon submitted an answer to the bar's petition. In response to the Martin-related allegations, Hanlon admitted that he had represented Martin and failed to move for withdrawal from representation following Martin's grievance against him, but denied that Martin had believed that his divorce was final. Hanlon denied that he had acted with neglect on the Martin case, and insisted that he had no ability to, or was prohibited from concluding Martin's divorce, as it would have been "a breach of professional conduct" to "proceed on behalf of a client who had filed a grievance against him for not adequately representing his interest." Hanlon further denied that his actions or omissions caused Martin any distress, embarrassment, or inconvenience. Additionally, Hanlon argued that the Martin grievance was barred by a five-year statute of limitations under Alaska Bar Rule 18.

Responding to the Rednall-related allegations, Hanlon admitted that he had represented Rednall in her personal injury claim, and that she had filed an earlier grievance against him for neglecting her claim and failing to respond to her inquiries about the claim. Hanlon also acknowledged his July 12 and October 24, 1996 letters to the bar. But Hanlon denied that they had "confirmed the validity" of Rednall's charges. Hanlon also denied the bar's claims that "he never filed any claim" on Rednall's behalf, that "[b]y the time Rednall filed her grievance, the statutory limitation periods on [Rednall's] civil claims had expired," and that Hanlon had failed to inform the bar and Rednall of either of these facts. Hanlon's denial of these charges was based on his reasoning that "there was no civil claim to be filed under the facts of this case and the Petitioner's exclusive remedy was for worker's compensation." Hanlon also insisted that "Ms. Rednall had no basis for a legal malpractice claim against him."

Hanlon admitted that his October 24, 1996 letter on the Rednall matter was "designed to convince Bar Counsel that he had successfully concluded a two-year effort to resolve Rednall's injury claim." But he denied that his letter of July 12, 1996 was "designed to lead Bar Counsel to believe that he was still working on the settlement of Rednall's injury claims and only waiting for her to sign a release." Hanlon also denied that the representations in his two letters were "deceptive and false," that the $1,600 that Rednall received under the "compromise and release" was paid by Hanlon personally, that Rednall did not learn that she had not actually settled with the state until the initiation of disciplinary proceedings, and that Hanlon had "fabricated the 'compromise and release' to prevent Rednall from learning about and filing a malpractice claim against him." Hanlon claimed that the Rednall claim was barred by the statute of limitations in Bar Rule 18. Hanlon then admitted that "he did pay Rednall $1,600 from his own pocket and did not disclose the source of such funds," but he denied that he had violated any rules of professional conduct, because "his actions did not harm Rednall," and he "then immediately informed the Bar Association of his conduct and offered to make amends."

The bar moved for summary judgment on the issue of whether Hanlon had violated the specified ethics rules, and asked that the committee "move on to hear the crux of this case: the sanction." Hanlon opposed sum-

mary judgment, suggesting that the bar had failed to prove its claims by the requisite clear and convincing evidence. Hanlon argued that his letters to the bar did not express, or left unclear, his state of mind in concluding the Rednall matter as he did. Referring specifically to Rednall's "claim and settlement," Hanlon argued that "[t]he Hearing Committee could infer [his] words to mean that settlement of the claim in question was Mrs. Rednall's claim against Mr. Hanlon." Likewise, Hanlon argued that his intent "cannot be gleaned from letters written by his counsel." Hanlon also distinguished several previous discipline cases as having been "considered on written stipulations of the facts by the attorney and the Bar."

However, several weeks later, Hanlon and the bar agreed to a "Stipulation on Background Facts, Disciplinary Violations and Controlling Law," to the committee. Hanlon admitted to negligent professional lapses in his representation of Martin and Rednall, and intentional ethical violations in responding to the bar's inquiry into the Rednall matter, and in fabricating Rednall's "settlement." Hanlon stipulated to the fact that both his July and October 1996 letters were "evasive and false" and that he fabricated the purported agreement in an attempt to avoid malpractice liability for not actively pursuing Rednall's claim. The stipulation noted that the damages resulting from Hanlon's behavior were uncertain, but that his deceptive conduct to the bar and Rednall potentially interfered with the attorney discipline process and undermined public confidence in the integrity of the legal profession. The stipulation also listed several aggravating and mitigating factors in Hanlon's case, and concluded that the "mitigating factors outweigh aggravating factors." The only issue left unresolved by Hanlon's stipulation was the appropriate penalty. Hanlon and the bar stipulated that in light of the uncertain damages and the applicable mitigating factors, suspension rather than disbarment would be the appropriate sanction.

The committee held a Sanctions Hearing on October 31, 2002, and issued a report and recommended sanction on September 4, 2003. The committee determined that Hanlon's negligent handling of both Martin's and Rednall's claims merited reprimand. The committee also agreed that suspension was the appropriate penalty for Hanlon's dishonest acts and statements in the Rednall case. The committee noted that while the harm that Hanlon had caused Rednall did not amount to "serious injury or potentially serious injury," his conduct was "extremely egregious," and "undermined the attorney discipline process and caused loss of public confidence in the integrity of the legal profession." The committee pronounced itself "deeply troubled by the deceptive and dishonest conduct exhibited" by Hanlon, and noted that although Hanlon's dishonest conduct would normally result in disbarment, in light of the parties' stipulation and Alaska case law, it recommended he be suspended for three years.

Hanlon appealed the committee's recommendation to the Bar's Board of Governors, arguing that the three-year suspension was excessive. The board unanimously adopted the findings, conclusions, and recommendations of the Hearing Committee. Hanlon appeals.

## III. STANDARD OF REVIEW

We independently review the entire record in attorney disciplinary proceedings.[1] We apply our independent judgment to questions of law and questions concerning the appropriateness of sanctions.[2] We examine each case individually, "guided but not constrained by the American Bar Association's Standards for Imposing Lawyer Sanctions, and by the sanctions imposed in comparable disciplinary proceedings."[3] In imposing attorney sanctions, we perform a three-step analysis: first we address the first three prongs of the ABA Standards by determining (1) the duty violated, (2) the lawyer's mental state, and (3) the extent of the actual

---

1. *In re Wiederholt,* 24 P.3d 1219, 1222 (Alaska 2001).

2. *In re Friedman,* 23 P.3d 620, 625 (Alaska 2001).

3. *Id.*

or potential injury.[4] Next we examine the recommended sanction under the ABA Standards for the misconduct found in the first step.[5] Finally, once we determine the recommended sanction, we decide whether and how the sanction should be affected by aggravating or mitigating factors.[6] We independently review the evidence related to aggravating and mitigating circumstances, but give great weight to a disciplinary board's factual findings.[7]

## IV. DISCUSSION

### A. Hanlon's Ethical Violations and Presumptive Punishment Are Undisputed.

Hanlon has stipulated (1) that he violated Bar Rule 15(a)(3) [8] when he supplied the bar with "misleading or deceptive" representations regarding the Rednall matter, and that he violated Alaska Rule of Professional Conduct (ARPC) 8.4(c) [9] when he "fabricated the compromise and release to unilaterally effect 'settlement' of a possible malpractice claim against him for failing to timely pursue Rednall's injury claims;" (2) that he acted with the intent to deceive Rednall and the bar in

committing these violations; and (3) that his deceptive conduct "potentially caused interference in a legal proceeding by undermining the attorney discipline process, and actually caused loss of public confidence in the integrity of the legal profession." The committee and board agreed. The first step of the ABA sanction process is therefore not at issue.

The committee also agreed with Hanlon and the bar that Hanlon's appropriate presumptive punishment is suspension under ABA Standard 6.12.[10] This issue is undisputed, and therefore the second step of our sanction process is also not at issue. Thus, the only issue in this case is step three, the selection of an appropriate sanction in light of Hanlon's conduct and the mitigating and aggravating factors.

### B. The Mitigating Factors in Hanlon's Favor Do Not Outweigh the Aggravating Factors Supporting a Relatively Severe Penalty.

■ We have noted in the past that "there is no 'magic formula' for determining how aggravating and mitigating circumstances affect an otherwise appropriate sanction." [11]

4. *Id.*

5. *Id.*

6. *Id.*

7. *Id.* at 632.

8. Alaska Bar Rule 15(a) states in relevant part: "the following acts or omissions by a member of the Alaska Bar Association ... will constitute misconduct and will be grounds for discipline ...: ... (3) knowing misrepresentation of any facts or circumstances surrounding a grievance."

9. Alaska Rule of Professional Conduct 8.4 states in relevant part: "MISCONDUCT. It is professional misconduct for a lawyer to ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

10. ABA Standard 6.1 states in relevant part:

Absent aggravating or mitigating circumstances, ... the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:

6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

. . . .

6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

Hanlon made false statements and submitted false documents with an intent to deceive Rednall and the bar, thus implicating section 6.11's disbarment sanction. However, Hanlon and the bar stipulated that the proper sanction was suspension under 6.12. While his deception may have caused some legal injury to Rednall and may have had an adverse impact on a legal proceeding, disbarment was not deemed to be warranted because the injury was not necessarily "serious" nor was the adverse impact necessarily "significant."

11. *Friedman*, 23 P.3d at 633 (citing *In re Buckalew*, 731 P.2d 48, 54 (Alaska 1986)).

Rather, "[e]ach case presents different circumstances which must be weighed against the nature and gravity of the lawyer's misconduct."[12] Hanlon and the bar stipulated that the mitigating circumstances of this case (the remoteness of Hanlon's one prior ethical violation, his cooperation with bar counsel, the long delay between his misdeeds and the bar inquiry, his good character and reputation, and his remorse)[13] outweigh the aggravating circumstances (Hanlon's prior violation, his selfish motive in misleading Rednall and the bar, and his pattern of misconduct and multiple offenses).[14] Despite this stipulation, the parties sharply disagree as to the appropriate period of suspension.[15]

Hanlon argues on appeal that the committee's discipline was too severe in light of mitigating factors such as his admission of misconduct to the bar, good character and reputation, and remorse; the harm to his career, family, and personal life that a three-year suspension is likely to cause; and relevant case law from other jurisdictions. We disagree.

12. *Buckalew,* 731 P.2d at 54.

13. ABA Standard 9.32 lists "[f]actors which may be considered in mitigation," including:
 (a) absence of a prior disciplinary record;
 (b) absence of a dishonest or selfish motive;
 (c) personal or emotional problems;
 (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
 (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
 (f) inexperience in the practice of law;
 (g) character or reputation;
 . . . .
 (j) delay in disciplinary proceedings;
 (k) imposition of other penalties or sanctions;
 (*l*) remorse;
 (m) remoteness of prior offenses.

14. ABA Standard 9.22 lists "[f]actors which may be considered in aggravation," including:
 (a) prior disciplinary offenses;
 (b) dishonest or selfish motive;
 (c) a pattern of misconduct;
 (d) multiple offenses;
 (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
 (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
 (g) refusal to acknowledge wrongful nature of conduct;
 (h) vulnerability of victim;

### 1. Hanlon's "cooperation" with the bar is not a mitigating factor.

■ American Bar Association Standard 9.32(e) allows mitigation where an attorney offers a "full and free disclosure" of wrongdoing, or exhibits a "cooperative attitude" toward the disciplinary proceedings. Hanlon's stipulation and appellate briefing suggest that despite his "initial misleading statements to the Bar," his later cooperation in the bar's disciplinary process ought to mitigate his punishment.

■ "While cooperation and disclosure are to be strongly encouraged, not every act of that sort deserves full mitigative effect."[16] A lawyer's admission of wrongdoing, when made only in response to an inquiry into that same wrongdoing, should not be considered a mitigating factor.[17] We have stated that where an attorney "turned himself in only *after* his misconduct was discovered by his law partner," his "claim of 'voluntary disclo-

(i) substantial experience in the practice of law;
(j) indifference to making restitution.

15. The committee recognized that disbarment is sometimes an appropriate penalty for deceiving clients or the bar. The committee concluded that suspension was the more appropriate penalty for Hanlon's Rednall conduct because the harm to Rednall did not "satisfy the definition of 'serious injury or potential serious injury'" under ABA Standards §§ 4.6 or 6.1. Unlike other client deception cases, Hanlon's conduct "did not include trust funds, conversion," or "a pattern of offenses," and Hanlon recognized the wrongfulness of his conduct, accepted responsibility, and experienced remorse. The committee thus recommended suspension rather than disbarment for Hanlon's actions after "considering the stipulation of counsel and the disbarment cases cited by the parties."

Hanlon, by contrast, apparently presumed that only suspension was applicable to his case from the outset, and thus views a three-year suspension as relatively severe.

16. *Buckalew,* 731 P.2d at 55.

17. *In re Morrill,* 904 P.2d 395, 397 (Alaska 1995) (Rabinowitz, J., dissenting) (quoting Hearing Committee findings).

sure' carries little weight."[18] If disclosure prompted by a partner's discovery of wrongdoing is not mitigative, then disclosure prompted by a bar investigation is even less so.

In *In re Whitt*[19] the defendant supplied false information and fabricated documents to bar investigators. The Washington Supreme Court held that "[t]he aggravating factor of providing falsified information during a disciplinary proceeding will not be mitigated because a wrongdoer makes an admission after being accused of deception," and that attorneys "should not be rewarded for 'coming clean' after lying in the disciplinary proceedings."[20] The court explained that "[a] holding to the contrary would encourage unscrupulous attorneys to defraud the disciplinary process and, if caught, only then admit their wrongdoings."[21] This reasoning accords with our own in *Buckalew* and *Mann*, and we find it persuasive in this case. Hanlon admitted wrongdoing only after it became clear that the bar was going to discover his earlier deceitful non-cooperation.

Indeed, contrary to his assertions on appeal, Hanlon's non-cooperation with the bar was hardly only "initial," and his eventual disclosures were not "fully and freely" given.[22] Hanlon first sent the bar the July 12, 1996 letter which deceptively referred to a "settlement" with Rednall and then sent another letter on October 24, 1996 stating that he had "resolved" Rednall's claim without disclosing the fact that he personally provided the funds for the payment to Rednall. Both letters were sent in response to bar inquiries and Hanlon attempted to mislead both the bar and Rednall for a considerable time; the October 24 letter was sent more than three months after the bar's initial inquiry and nearly three months after Hanlon convinced Rednall to sign the "settlement." Hanlon provided the Rednall file to the bar only in response to the bar's November 25, 1996 directive. Furthermore, even after submitting his Rednall file to the bar, admitting that he had never filed any case on Rednall's behalf, and admitting that he had forged the "settlement" to avoid a malpractice charge, Hanlon continued to litigate his case in an adversarial fashion. Hanlon's answer to the bar's petition denied much of his alleged wrongdoing, as well as the accompanying harm to Martin and Rednall to which he later stipulated. Hanlon's answer also falsely stated that he had "immediately informed the Bar Association of his conduct and offered to make amends." Hanlon opposed summary judgment on the wrongdoing and harm issues, and insisted that his conduct had been "fluid and open to interpretation."

In light of this record, we find Hanlon's argument that he deserves mitigation for cooperating with the bar to be unpersuasive, and accordingly, hold that Hanlon's alleged cooperation with the bar is not a mitigating factor. Indeed, Hanlon's behavior in responding to the bar's inquiry triggers three aggravating factors enumerated by ABA Standard 9.22:(1) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (2) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; and (3) refusal to acknowledge the wrongful nature of his conduct. These aggravating factors could have potentially led to Hanlon's disbarment.[23] However, for the reasons dis-

---

18. *In re Buckalew*, 731 P.2d at 55 (emphasis in original). *Cf. In re Mann*, 853 P.2d 1115, 1119–20 & n. 12 (Alaska 1993) (imposing only three-year suspension for normally serious violation of misappropriation of client funds, where attorney "voluntarily turned himself in to the Sitka police and the Alaska Bar Association before anyone discovered his misappropriation," where in absence of such self-disclosure, attorney's crime "easily could have gone undetected.").

19. 149 Wash.2d 707, 72 P.3d 173 (2003).

20. *Id.* at 180.

21. *Id.*

22. *See supra* Part II.A–B.

23. *See, e.g., In re Peartree*, 180 Ariz. 518, 885 P.2d 1083, 1085 (Ariz.1994) (intentional obstruction of disciplinary proceedings aggravated unethical termination of representation of client, warranting disbarment); *Florida Bar v. Weisser*, 721 So.2d 1142, 1145–46 (Fla.1998) (material misrepresentations at bar disciplinary proceedings and refusal to acknowledge wrongfulness of misconduct further support disbarment for unauthorized practice of law).

cussed below, we feel a sanction less than disbarment is appropriate in this case.

### 2. The effects of a three-year suspension on Hanlon's career, personal reputation, and family are not mitigating factors.

 Hanlon also argues that the disciplinary inquiry "in some ways is always personal and depends upon the particular persona of the lawyer involved," and "[w]hat the Bar Association los[t] track of in its analysis of this case is the person involved in this process." Hanlon stresses his marriage and seven children, his ten-year solo practice, and his involvement in church and prison ministry activities. Hanlon argues that "[e]very lawyer [ ] makes mistakes in his career," and he did so in this case "because he was a human being and he was afraid for his future and the future of his family." Hanlon insists that he is already "disgraced at home and church," and "reviled in reputation," and argues that a three-year suspension would force him "to close his office and seek a new career employment to support himself and his family," and suggests that this would be counterproductive, in the sense that "he won't ever make a mistake as a lawyer again because he won't be one."

 However, even assuming that a three-year suspension would effectively end Hanlon's career, that fact cannot carry the weight that Hanlon gives it. As Hanlon himself admits, "[t]he primary purpose of lawyer discipline is to protect the public." We have stated that "[i]t is the solemn duty of this court to regulate the practice of law in this state and to see that the integrity of the profession is maintained by disciplining attorneys who indulge in practices inconsistent with the high ethical standards demanded of all members of the bar."[24] Similarly, in recommending Hanlon's suspension the committee stressed that "the interests of the public and the Bar Association will be served by this level of discipline."

Neither Alaska law nor the ABA Standards regard the likely effects of a penalty on a lawyer's business, family, and personal reputation as mitigating factors. Nor should they. As the Arizona Supreme Court has suggested, if the effect of sanctions upon an attorney's practice and livelihood were considered mitigating factors, they would apply in virtually every case.[25] While a few courts have weighed the family effects of attorney discipline as a sanction-mitigating factor, they have done so only in fairly extreme circumstances that are not present in this case.[26] The general rule is that "the risk of damage to a lawyer's livelihood is a natural consequence of any disciplinary proceeding against him."[27] And "every suspension carries with it 'pain' for the suspended attorney. This 'pain' is a necessary element of any suspension because it serves as both a general and specific deterrent to future misconduct."[28] Thus, we hold that the potential effect of the suspension on Hanlon's practice,

---

24. *In re Preston*, 616 P.2d 1, 5 (Alaska 1980) (quoting *Disciplinary Bd. of the Haw. Supreme Court v. Bergan*, 60 Haw. 546, 592 P.2d 814, 818 (Haw.1979)); (*People ex rel. MacFarlane v. Harthun*, 195 Colo. 38, 581 P.2d 716, 718 (Colo. 1978)); *see also Buckalew*, 731 P.2d at 51–52 (affirming that court has duty to maintain integrity and ethical standards of bar and adopting ABA Standards for Imposing Lawyer Sanctions).

25. *In re Shannon*, 179 Ariz. 52, 876 P.2d 548, 567 (1994).

26. In *In re Tapper*, 102 A.D.2d 332, 477 N.Y.S.2d 16 (N.Y.App.Div.1984), an attorney was suspended from practicing law for six months for falsely reporting his car was stolen even though "in many instances of false swearing the attorney is suspended for one year." *Id.* at 334, 477 N.Y.S.2d 16. Because of the attorney's personal problems, including his wife's lengthy illness and death, his inability to practice for much of the past year due to his own illness, and because he was the sole provider for his deaf son and had "no viable alternative to making a living," the court held that "any lengthy suspension would result in severe deprivation." *Id.* The court also noted a number of other mitigating factors, including the fact that the conduct was an "isolated act of aberrant behavior" in a career marked by "activities on behalf of the community and charitable organizations," and that the attorney was entitled to recover insurance benefits similar to the benefits he would have been entitled to had his car been stolen. *Id.*

27. *Ely v. Whitlock*, 238 Va. 670, 385 S.E.2d 893, 896 (1989).

28. *Shannon*, 876 P.2d at 567.

reputation, or personal life is not a mitigating factor.

### 3. The remaining mitigating factors do not require departure from the committee's recommendation of a three-year suspension.

■ In light of our rejection of the previous proposed mitigating factors, we must determine whether the remaining mitigators are sufficient to warrant a lesser sanction than a three-year suspension. Hanlon and his character witnesses insist that his unethical conduct was aberrational and unlikely to recur, and that Hanlon feels great remorse. Hanlon's stipulation also points out that his one prior ethical violation was minor and "remote in time and circumstances." The bar does not dispute these points.[29]

■ A good prior record, remorsefulness, and the unlikelihood of recurring violations are undeniably factors that mitigate attorney disciplinary cases. However, the extent of

this mitigation differs from case to case; as noted earlier there is no "magic formula" for imposing disciplinary sanctions.[30] Some cases in other jurisdictions suggest that these mitigating factors may reduce suspensions for similar unethical acts to less than three years.[31] But in numerous other cases, courts have imposed long suspensions despite the presence of these factors,[32] although such mitigating factors have been relied upon to reduce sanctions of disbarment to suspensions.[33] Indeed, in *Whitt*, violations very similar to Hanlon's resulted in disbarment, although after the court had rejected significant mitigating factors.[34] Because we accept the undisputed mitigating factors in Hanlon's case, we hold that the lesser sanction of a three-year suspension is sufficient and appropriate.

Such a sanction is in line with our own case law given the severity of Hanlon's offense and our duty to protect the public and maintain the integrity of the legal profession.[35]

---

**29.** But note our suggestion in *In re Mann*, 853 P.2d 1115, 1119–20 & n. 15 (Alaska 1993), that unprompted self-disclosure, cooperation with authorities, and public apology are telling indications of remorse.

**30.** *In re Friedman*, 23 P.3d 620, 633 (Alaska 2001).

**31.** *See, e.g., In re Barratt*, 663 N.E.2d 536, 538–41 (Ind.1996) (imposing one-year suspension on attorney who created false letter and offered false testimony to avoid discipline in another matter, considering his twenty-year practice without prior violations, bar activities, and expressions of remorse); *In re Solarsh*, 205 A.D.2d 73, 74–75, 618 N.Y.S.2d 21 (N.Y.App.Div.1994) (imposing six-month suspension for attorney who neglected two matters and then lied and submitted false documents to clients to forestall their inquiries, in light of lack of prior ethical violations, generally good reputation, complete cooperation in disciplinary process, clear remorse, lack of personal gain, heavy stresses at time of violation, and "substantial negative consequences" already incurred).

**32.** *See, e.g., People v. Anderson*, 817 P.2d 1035, 1037 (Colo.1991) (imposing three-year suspension for attorney's "pattern of misconduct and neglect" in representing clients despite prior record of good conduct, remorse, and cooperation with grievance committee); *In re Pirro*, 305 A.D.2d 22, 23–24, 759 N.Y.S.2d 527 (N.Y.App. Div.2003) (imposing three-year suspension for tax fraud, despite attorney's "previously unblemished record," "deep remorse," "excellent repu-

tation for professionalism and altruism," full cooperation with investigation, and completion of nearly two-years of interim suspension); *Office of Disciplinary Counsel v. Chung*, 548 Pa. 108, 695 A.2d 405, 407–08 (1997) (imposing five-year suspension on attorney for false statements to federally insured bank, despite extensive community involvement, excellent reputation, remorse, and eight-year period since prior misdeed).

**33.** *Anderson*, 817 P.2d at 1037; *Chung*, 695 A.2d at 408.

**34.** *In re Whitt*, 149 Wash.2d 707, 72 P.3d 173, 175 (2003). In *Whitt*, the attorney failed to respond to her client's repeated telephone calls and requests that she depose certain witnesses, agreed to dismiss the client's case with prejudice without informing the client of the dismissal, allegedly submitted false information and fabricated documents in order to mislead a subsequent bar inquiry into the client's complaint, and displayed indifference towards returning $339.75 in residual funds that she owed the client. *Id.* at 175–6. The attorney did not cause her client "serious or potentially serious injury," *id.* at 179, and admitted her falsifications when challenged by the bar. *Id.* at 176–77. The court rejected remorse and personal and emotional problems as mitigating factors. *Id.* at 181.

**35.** In cases involving worse ethical violations than those at issue here, we have imposed harsher sanctions. *See In re Buckalew*, 731 P.2d 48, 49 (Alaska 1987) (imposing disbarment on attorney who failed to oppose opponent's summary

We have recognized that "even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession." [36] And we have a "duty to discipline lawyers who indulge in practices inconsistent with the high ethical standards imposed upon the legal profession in this state." [37] These principles, together with the severity of Hanlon's misconduct and the "great weight" we give findings made by the board,[38] support imposition of a three-year suspension in this case.

## V. CONCLUSION

We suspend James J. Hanlon from the practice of law for three years.

judgment motion, failed to inform client when unopposed motion was granted, falsely informed client that opponent had "settled" and offered false "settlement" document, and then embezzled funds from other clients' trust accounts to make fake "settlement payments" to client); *In re Stump*, 621 P.2d 263, 264 (Alaska 1980) (imposing five-year suspension on attorney who falsified document for use in pending litigation in which he was named as defendant, and falsely affirmed authenticity of document while under oath on three separate occasions), superseded on other grounds, *Buckalew*, 731 P.2d at 51.

Conversely, in cases involving lesser ethical violations than those at issue here, we have imposed lighter sanctions. *See In re West*, 805 P.2d 351, 352–53, 359–60 (Alaska 1991) (imposing ninety-day suspension on attorney who encouraged client to forge recently deceased husband's

signature on settlement offer and then notarized this signature, finding that resultant harm was minor or nonexistent and attorney acted only to further client's interests); *In re Walton*, 676 P.2d 1078, 1079–80, 1085–86 (Alaska 1984) (imposing eighteen-month suspension for falsifying evidentiary document attached to complaint, similarly done to further client's interests).

36. *West*, 805 P.2d at 355 (quoting MODEL CODE OF PROF'L RESPONSIBILITY EC 1–5 (1980)).

37. *Buckalew*, 731 P.2d at 51 n. 7 (citing *In re Preston*, 616 P.2d 1, 4–5 (Alaska 1980)).

38. *In re Friedman*, 23 P.3d 620, 632 (Alaska 2001).